FILED
04/25/2024
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEAL S OF TENNESSEE
AT KNOXVILLE
March 26, 2024 Session

## STATE OF TENNESSEE v. WARREN J. NOSTROM

**Appeal from the Criminal Court for Cumberland County**
**No. 18-CR-326      Gary McKenzie, Judge**

_____

**No. E2023-00299-CCA-R3-CD**
_____

A Cumberland County jury found Defendant, Warren J. Nostrom, guilty of two counts of first degree premeditated murder.  The trial court imposed concurrent life sentences.  On appeal, Defendant argues that (1) the evidence was insufficient to support his convictions, and the trial court erred by (2) finding Defendant competent to stand trial and precluding an attorney from testifying as an expert at the competency hearing, (3) admitting Defendant's pretrial statement to police, and (4) denying Defendant's motion for a continuance.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Howard L. Upchurch, Pikeville, Tennessee, and Samuel F. Hudson, Dunlap, Tennessee, for the appellant, Warren J. Nostrom.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Phillip A. Hatch and Amanda Worley, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Background

Defendant was convicted for the September 14, 2018 killings of his estranged wife, Joy Nostrom, and her boyfriend, Mark Gunter. At the time of the victims' deaths, Defendant and Ms. Nostrom were involved in a pending divorce case. Defendant also shot himself during the incident, but that bullet grazed the top of his head.

### A. Suppression Hearing

On January 7, 2019, the Cumberland County Grand Jury indicted Defendant for two counts of first degree premeditated murder of Ms. Nostrom and Mr. Gunter. Defendant later filed a motion to suppress his statement that he gave to police officers following the killings. At the June 22, 2021 hearing on Defendant's motion to suppress, Dr. Mark Fox, a surgeon who also served as the medical director for Cumberland County's Emergency Medical Services at the time of the offenses, testified that around 2:45 p.m. Central time on September 14, 2018, he responded to the Cumberland County Schools' transportation office and school bus garage on Genesis Road in Crossville, where the shootings of the victims and Defendant took place. When Dr. Fox first saw Defendant at the location, Defendant had already been given a breathing tube and administered medication. A medical helicopter arrived at 3:07 p.m. and left fifteen minutes later, transporting Defendant to Erlanger Hospital in Chattanooga. Hospital records indicate Defendant was first seen at Erlanger at 3:59 p.m.[1] While Dr. Fox did not treat Defendant at the scene or accompany Defendant to the hospital, the trial court accredited Dr. Fox as an expert in trauma care and emergency medicine, so he was able to review Defendant's medical records and offer his opinion testimony accordingly.

Dr. Fox testified that Defendant was treated with ten milligrams of midazolam, a sedative, and eight milligrams of morphine, a narcotic pain medication, before being flown to Erlanger. On the flight, he was given a five-milligram dose of midazolam along with two one-hundred-microgram doses and one fifty-microgram dose of fentanyl, another narcotic pain medication. Dr. Fox testified these medications were "[r]apid onset, short in duration, meant to control pain." Throughout his testimony, Dr. Fox emphasized that the medications Defendant was administered had "a relatively short[-]acting effect."

---

[1] "For clarity, we have eliminated distinctions between time zones referenced in the appellate record. The facts set forth in this opinion reflect the time the event occurred in Central time.

- 2 -

At Erlanger, doctors stapled closed a scalp laceration on the crown of Defendant's head. The laceration was three centimeters long and one-and-a-half centimeters deep; Dr. Fox described the injury as "superficial." X-rays showed no skull fracture. At the hospital Defendant was given four additional doses of fentanyl, totaling three hundred micrograms: one-hundred-microgram doses at 4:10 and 5:20 pm., and fifty-microgram doses at 4:52 and 5:17 p.m. Defendant was also given a two-milligram dose of midazolam at 4:11 p.m.

Hospital records indicated Defendant was cleared for discharge at 6:20 p.m. on the evening of September 14, 2018. A notation in Defendant's medical records states, "A.O. times three," which Dr. Fox explained meant "Alert and oriented. And times three means to person, place, and time. Or events." Dr. Fox stated that were a patient not alert as to these three things, the patient would, usually, not be discharged. The records also reflect that throughout the two hours he was in the hospital, Defendant was assessed using the Glasgow Coma Scale, which Dr. Fox described as "an industry standard that was established . . . to provide objective assessment of one's mental status in terms of three components: eye movement, that is eye actions; verbal response; and motor or muscular response." In the last Glasgow assessment taken before Defendant's discharge, Defendant scored a 15, which the highest score possible on the test.

Dr. Fox acknowledged that the Defendant's custodial interview began shortly after midnight the morning of September 15, 2018. Dr. Fox opined that in his "professional opinion, within a reasonable degree of medical certainty . . . those medications would not have had an ongoing effect on [Defendant] after midnight." Dr. Fox acknowledged he reviewed the video recording of Defendant's custodial interview, and the physician denied that Defendant suffered from "delirium, hallucinations, concentration issues, change in mood, [or] loss of consciousness" during the interview.

When asked whether the medications administered to Defendant "would have a more significant or exacerbated effect on an individual who suffers from dementia," Dr. Fox responded, "It may have a more immediate effect, if that's what you mean by adverse effect." When asked whether the effects of the medication would be longer-lasting for a dementia patient, Dr. Fox replied that while an older person can take longer to "clear" a medication from his system, "Alzheimer's itself is not noted to adversely be affected or slow the rate of [f]entanyl metabolism."

Lieutenant Dustin Lester of the Crossville Police Department drove Defendant from Erlanger to the Cumberland County Jail after Defendant was released from the hospital. The lieutenant arrived at the hospital while Defendant was being treated and saw Defendant's head being stapled. The lieutenant stated that Defendant did not react to the stapling and acknowledged that the medical staff "had him out pretty well[.]" At discharge, Defendant was placed in a wheelchair and wheeled to the lieutenant's police cruiser. They

arrived at the Cumberland County Jail at 8:10 p.m. on September 14. The lieutenant stated that at one point, Defendant attempted to speak to him, but the lieutenant told Defendant that "I wasn't allowed to speak to him." When asked if Defendant was sleeping, the lieutenant stated that he "was pretty well out the whole time. He didn't make any statements or comments."

Tennessee Bureau of Investigation (TBI) Assistant Special Agent in Charge Jason Legg recalled being dispatched to the crime scene on September 14, 2018. When he arrived, the male victim, Mr. Gunter, had been removed from the scene, but the female victim, Ms. Nostrom, was still present. Agent Legg testified that Ms. Nostrom died from a gunshot wound to the head, and Mr. Gunter died from a gunshot wound to the chest.

Agent Legg acknowledged that during his investigation he became aware of marital difficulties between Defendant and his estranged wife, including Defendant's filing for divorce and Ms. Nostrom obtaining at least two orders of protection against Defendant. Agent Legg noted the first order of protection was taken out April 9, 2018, and dismissed April 16 of that year. Another order of protection was obtained May 25, 2018, and dismissed June 11 of that year. A third order of protection was obtained August 13, 2018, and was still active at the time of the offense. In the affidavit in support of one order of protection, Ms. Nostrom wrote about an incident at a Crossville restaurant in which Defendant approached the victims while they were eating and threatened to shoot Mr. Gunter. Agent Legg noted that per the terms of one order of protection, Defendant had agreed to turn over all his firearms. Defendant had completed a written form stating that he had surrendered his guns to a person legally allowed to keep them. Agent Legg testified that Defendant had filed for divorce shortly before the offenses occurred. Agent Legg also acknowledged that Defendant was represented in his divorce by one of the attorneys representing him in the current appeal.

Agent Legg's interview of Defendant began shortly around 12:40 a.m. on September 15, 2018. TBI Special Agent Hunter Locke was also present for the interview. Agent Legg recalled that when Defendant took his seat at the interview table, he "immediately began talking." The agent had to interrupt Defendant "numerous" times to get him to listen to the rights set forth in the *Miranda* waiver. Portions of the video recording of the interview were played in court and transcribed by the court reporter; at the start of the video, Defendant claimed he had served in law enforcement in Suffolk County, New York, and had aided in the investigation into the 1996 explosion of TWA Flight 800. When Agent Legg told Defendant that he had to "waive [his] rights for us to be able to talk to [him]," Defendant mentioned he had an attorney because he was going through a divorce. He did not ask for the attorney to be present at that point, however. Eventually, Agent Legg was able to read the rights waiver and have Defendant sign the waiver. During the interview, Defendant did most of the talking, and Agent Legg asked few questions.

- 4 -

Agent Legg acknowledged that Defendant was "cordial," "agreeable," and expressed a "willingness to speak" during the interview.

In another portion of the interview played during the suppression hearing, Defendant told Agent Legg that when Ms. Nostrom left, "I couldn't take that house no more. I have too much on me. I couldn't sell it." Defendant said he was attempting to "hold off on the divorce" and attend mediation, but the day of the offenses Defendant "went nuts" because he "saw her with another guy. And I followed her. We went over to the justice center[.]" In another portion of the video, Defendant stated that later that day,

> I don't know, there was something inside of me. It was like an inferno, and was going and going and going. And I saw her go by. I went to get gas up here. It's $2.39. And I saw, I saw her going. I went to—I pulled into the yard, and I, I pulled out the gun. I couldn't believe I did this. I couldn't believe I did this. And I shot him. First the guy come out, and I hit him. And then, uh, I walked over to her, and—and—and I hit her. And I went to put the gun to my head, and, I don't know, I guess I must have . . . .

In another portion of the interview, Defendant said he had previously encountered Ms. Nostrom and Mr. Gunter at a Mexican restaurant. Defendant walked to the table where they were seated, and Defendant told Mr. Gunter, "Excuse me, that's my wife." Defendant claims Mr. Gunter replied, "You better get out of here before I call the cops." Agent Legg testified that this was noteworthy to him because Ms. Nostrom had filed the aforementioned order of protection against Defendant following the restaurant incident. Defendant also told the agent that Ms. Nostrom "dropped" two other orders of protection.

Later in the interview Defendant told Agent Legg that pursuant to the order of protection, he had turned over his guns to a man named Ed Jones, who supposedly still had the guns as of the interview. Defendant said he "forgot all about" the handgun he used in the shooting, acknowledging he had it in the console of his van before the shooting.

Toward the end of the interview, Defendant said Ms. Nostrom "was a good woman before. I don't know what happened to her. Always trying to get over on me lately." Defendant claimed Ms. Nostrom lied to him, took money from him, and also took money from her employer. Defendant wondered aloud, "What, what turned the woman off to me? Am I getting too old? I'm 74 years old. She's 58." At this point, Agent Legg attempted to obtain consent from Defendant for a cellular phone search; Defendant replied that he "better wait for [his divorce attorney]. . . . I see the way that's being read[.]" After a brief exchange that included Defendant repeating that he should wait for his attorney, the interview ended.

- 5 -

Agent Legg testified that Defendant mentioned being a law enforcement officer several times during the interview but had never worked in law enforcement. The agent recalled Defendant's head was bandaged during the interview, and he also recalled that Defendant claimed to have been awake since about 3:30 the previous morning. Agent Legg acknowledged that Defendant had attempted suicide before the interview, and he also acknowledged that at the time of the interview he had no information about Defendant's medical treatment after he was transported to Erlanger.

Agent Legg also testified that he had seen nothing in the record suggesting Defendant had violated an order of protection before the victims' deaths. He further acknowledged that Defendant had filed the divorce petition against his wife, and in the complaint Defendant alleged health issues entitling him to spousal support.

Regarding Defendant's behavior during the interview, Agent Legg agreed that a person's inability to follow instructions and constant interruption of an officer could be indications of impairment. Agent Legg confirmed Defendant repeatedly interrupted him during the interview, especially while reading the *Miranda* warnings.

Forensic psychiatrist Stephen Montgomery, accredited by the trial court as an expert in forensic psychology, conducted a forensic evaluation of Defendant in June 2020. Due to COVID-19 protocols that prevented face-to-face contact in the Cumberland County Jail, Dr. Montgomery was unable to conduct an in-person interview with Defendant, which he said prevented him from administering a "full evaluation[.]" Dr. Montgomery recalled that Defendant was seventy-five years old when he completed the evaluation. Defendant had a history of high blood pressure, chronic obstructive pulmonary disease (COPD), and prostate cancer, and he had attempted suicide less than two years before these offenses. Defendant attended school through ninth grade. Dr. Montgomery testified that Defendant admitted to him that Defendant had never served in law enforcement, despite his statements to police.

Dr. Montgomery stated that during the "brief testing" he was able to conduct over video conference, Defendant was "alert and oriented," but "he could not do basic computations, had difficulty with concentration. And I was concerned about his cognitive functioning." Dr. Montgomery said that Defendant was unsure about dates for certain events and told the doctor, "I can't remember a lot of things." After the evaluation, Dr. Montgomery referred Defendant to a neuropsychologist, Dr. Malcolm Spica, for additional testing. Dr. Spica was able to conduct his testing in person, and Dr. Montgomery testified that Defendant "performed very poorly on most of the tests." Dr. Montgomery acknowledged that in Dr. Spica's report, he wrote that Defendant "appeared alert, but mildly confused, forgetful, and unable to recall specific aspects of his past." Dr. Spica also administered testing for dementia, and Dr. Montgomery testified that Defendant's test

results showed Defendant to be "[v]ery far into the range associated with clinical dementia." Defendant's greatest impairments, per Dr. Spica, were in the areas of visual analysis and executive functioning, or as Dr. Montgomery described it, "putting everything together . . . and making rational decisions." Dr. Montgomery also testified that Defendant "scor[ed] in the borderline intellectually disabled range with an IQ of 68[.]" Additionally, Dr. Spica found Defendant to have poor focus and attention span and to be suffering from anxiety and depression. In all, Dr. Spica's testing indicated Defendant's intellectual ability was, at that time, "commensurate with that of a six-year-old child."

Dr. Montgomery stated that Defendant maintained some "delusional beliefs"; specifically, Dr. Montgomery asserted that Defendant "has maintained . . . that his wife did not die from a gunshot wound, but instead collapsed and died from some other reason. . . . [H]e maintains that belief and cannot be dissuaded, even saying that perhaps the autopsy report was done incorrectly." Dr. Montgomery testified that Defendant suffered from Lewy body dementia. Dr. Montgomery explained that unlike Alzheimer's disease, which "may be more focused on memory, Lewy body, and other dementias, may manifest more in impairments, and judgment, and impulse control." Dr. Montgomery explained that Defendant's history of heart disease and chronic lung disease placed Defendant "at risk for developing that type of dementia," as Lewy body dementia was a type of vascular dementia, "where blood supply to the brain is compromised over time, where parts of the brain tissue die from lack of oxygen supply."

Dr. Montgomery testified he reviewed the video of Defendant's interview with the TBI agents after his arrest. Dr. Montgomery observed that during Agent Legg's advising Defendant of his *Miranda* rights, "It appeared that . . . [Defendant] was very talkative and was not paying very close attention. He was just wanting to . . . talk himself and not listen to what he was being told." Conversely, at the end of the video, when the TBI agents attempted to obtain consent to search Defendant's cellular phone, Defendant was not as talkative. By that point of the interview, Dr. Montgomery testified, Defendant "seemed calmer." Dr. Montgomery observed that "it does not make a lot of sense that he would give a confession like that, and then all of a sudden want to be concerned about contacting his lawyer about the cellphone issue. It does not seem consistent."

When asked whether he had an opinion as to whether Defendant "knowingly, intelligently, and voluntarily waived his *Miranda* rights," Dr. Montgomery responded,

> I think it's unclear. I think there are certain reasons to question whether or not he was, because of his dementia, that was already present at that point, because of his depression, because of sleep deprivation, the injury he sustained that day, the trauma of the whole incident, being sedated, being intubated. So, I think, for all of those reasons, and the way he was acting, he

- 7 -

was very talkative, he was tearful, he was emotional, he was saying things that were not true. And so, I think, the only way to be sure that he really fully understood what he was—what rights he was waiving would have been for them to ask each of those portions of rights, to get him to paraphrase that, to saw what exactly are you agreeing to. I think, based on the video, he could have been read pretty much anything, and he would have agreed to sign it, because he wanted to talk.

As explored in greater detail below, the trial court concluded that Defendant executed a "knowing and voluntary waiver of his *Miranda* rights," and thus the trial court denied Defendant's motion to suppress his statement to law enforcement. The case then proceeded to trial.

## B. Trial

Brooke Golden, a deputy clerk with the Cumberland County Circuit Court Clerk's Office, testified that Ms. Nostrom was granted an order of protection against Defendant on August 13, 2018. As part of that order of protection, Defendant agreed to turn over his firearms. The day after the order of protection was granted, Defendant signed a written declaration stating he had surrendered his firearms accordingly. Ruthie Potter, an employee with the Cumberland County Clerk and Master's Office, testified that Defendant filed for divorce on August 24, 2018.

Joel Padgett owned Plateau Truck and Tractor ("Plateau"), an equipment rental business located next to the Cumberland County Schools transportation office, which also housed the county's school buses. Surveillance video from cameras outside Plateau were introduced into evidence; Mr. Padgett acknowledged that video of the incident showed that several "pieces of machinery" in Plateau's parking lot partially obstructed the view between his business and the school bus garage. However, he stated there were spaces between the equipment which made it possible to see between the two locations, depending on where one stood. Mr. Padgett did not see the shootings himself.

On the afternoon of the offenses, Eddie Pugh was at Plateau with his son returning a Kubota farm tractor. Mr. Pugh testified that after dropping off the tractor, he and his son went to their truck in Plateau's parking lot to retrieve paperwork. As the two men approached their truck, Mr. Pugh heard a gunshot. Mr. Pugh then ran to the fence between the truck business and the school bus garage. He saw a man lying on the ground and another man with a gun walking around a school bus. After hearing the first gunshot, Mr. Pugh heard a woman scream. Mr. Pugh then heard two additional gunshots, and after the second of these gunshots, Mr. Pugh did not hear the woman screaming any longer. A few

seconds later, Mr. Pugh heard a fourth gunshot, after which Mr. Pugh called out for help. When someone exited Plateau's office, Mr. Pugh went to the school bus garage.

Upon arriving at the garage, Mr. Pugh saw a man lying on the ground. Mr. Pugh then walked around the bus and saw a man and a woman lying close to each other. Mr. Pugh said the man lying close to the woman had "the exact same clothes on" as the man he had seen walk around the bus earlier. Mr. Pugh was then approached by another man who said he was a mechanic; this person said one of the men lying on the ground was the shooter, and the weapon used had been kicked under the bus.

Mr. Pugh acknowledged he did not know any of the persons involved in the shooting. He also reiterated that he did not see the first man get shot. Mr. Pugh also acknowledged he told TBI agents who interviewed him previously that after the one man walked around the school bus, Mr. Pugh was only able to see this man's legs.

Wayne Upchurch, a bus driver and mechanic with the Cumberland County school system, was at the school bus garage the day of the shooting. At around 2:25 p.m., Mr. Upchurch was in the secretary's office at the school bus garage with the school system's transportation director, Becky Reed, waiting to begin his bus driving shift. Mr. Upchurch heard a "bang," which caused him and the other employees in the office to look out the window. Mr. Upchurch saw Ms. Nostrom's "legs and her feet . . . at the side of the bus." Mr. Upchurch saw another person lying near a white van; when Mr. Upchurch went to the van, he saw this person was a man lying motionless. Mr. Upchurch then noticed Ms. Nostrom and another man lying close together near a school bus. When Mr. Upchurch reached these two persons, he saw a handgun near the man's right hand, so Mr. Upchurch moved the gun with his foot away from the man's hand and underneath a bus. Mr. Upchurch acknowledged he did not see anyone get shot.

Ms. Reed testified that Ms. Nostrom was a bus driver with the Cumberland County school system, and Ms. Nostrom normally arrived at the school bus garage between 2:00 p.m. and 2:30 p.m. daily to retrieve her bus for her afternoon route. Ms. Reed knew Ms. Nostrom was married to Defendant, whom she identified in court. Like Mr. Upchurch, Ms. Reed testified that she was working in the secretary's office around 2:30 p.m. on September 14, 2018, when she heard what sounded like a gunshot. She looked out the window and heard two more gunshots but did not see anyone get hit. Ms. Reed then dialed 911 and spoke to the dispatcher briefly before handing the phone to another employee and heading outside. When she arrived outside, she saw Ms. Nostrom's body on the ground near Defendant, who was also on the ground. Ms. Reed did not recall whether she saw a gun. She also recalled seeing a third body lying next to a white van. Ms. Reed testified that before the day of shooting, she had spoken with Defendant, who had "assured [her]

that there would not be any problems at the school bus garage." She did not know the other victim.

Agent Legg was the lead TBI investigator in this case. At trial, he testified he went to the school bus garage after the victims had been pronounced dead and Defendant was flown to Chattanooga to be treated for his gunshot wound. Upon arriving at the scene, Agent Legg observed a white van and a red Dodge Neon, in addition to the school buses. The agent testified that Mr. Gunter's body was found eight to ten feet away from the van, and the crime scene investigation showed that a bullet struck one of the school buses at the garage. Investigators also found three shell casings; one was found a considerable distance from Ms. Nostrom's body, in the "window well" of the van, while the other two casings were found close to her body. Agent Legg testified a gun was found "almost underneath the bus, about halfway between the wheel wells." Based on its location, Agent Legg believed the gun had been moved to where it was found. He testified that the magazine found in this handgun had a capacity of seven rounds, and three rounds were found in the magazine at the gun's recovery, leading him to believe the gun was fired four times. A similar magazine was found inside the van at the crime scene.

Agent Legg testified that Mr. Gunter, the male shooting victim, had a criminal history, including two 1989 convictions for driving under the influence and assault with a deadly weapon on a police officer and two 2006 convictions for felon in possession of a weapon and assault with a deadly weapon on a government official. Agent Legg denied that Defendant told him that Defendant had prior knowledge of Mr. Gunter's criminal history.

The video of Agent Legg's interview with Defendant was played at trial. In addition to the sections detailed above, at the beginning of the interview Defendant told Agent Legg that he had a "beautiful marriage" with Ms. Nostrom for over thirty years, but in the last two years of the marriage she became addicted to diet pills. Defendant also told the agent that one day, Defendant's wife told him that "she was in bankruptcy." Defendant also claimed his wife then "got into a bad crowd" and was involved in "prostitution . . . on the weekends." According to Defendant, these things led him to believe "there must be somebody else." However, his suspicions were not confirmed until he saw Ms. Nostrom with Mr. Gunter at a local restaurant.

At the time of the offenses, Defendant told Agent Legg, Ms. Nostrom was not living at the family house. He claimed he told his wife to come back to the house, but she did not. Instead, Defendant helped her move her belongings from the home to a storage unit, and she did not tell Defendant where she was moving when asked. The breakup of Defendant's marriage was particularly difficult on him; specifically, Defendant stated, "I ain't been feeling good ever since she left. I tell you, I'm broken hearted. Thirty-six years.

That's a long time." The breakup of this marriage reminded Defendant of the end of his first marriage, which ended in divorce and was also difficult on him. Defendant also told Agent Legg that before the shooting, Ms. Nostrom had taken a truck from him and hidden it in North Carolina. Defendant also claimed his wife had "stolen" another vehicle from him the day before the shooting.

In describing the events leading to the offense, in addition to the portions of the video played at the suppression hearing and detailed above, Defendant said he had gone to see Ed Jones at the gas station on West Avenue at 3:30 a.m., but the door was locked and Mr. Jones was asleep inside the station. Defendant said he "went out in my car, and . . . laid across the back seat with a pillow." Defendant claimed to have stayed there until "maybe a quarter till 2:00 [p.m.], something like that," before heading "[r]ight to Speedway." Defendant told Agent Legg that when he was at the Speedway across the street from the bus garage and saw Ms. Nostrom drive into the garage, he "made a U-turn in the middle of the road" and drove to the garage. He said he only intended to ask his wife, "What are you doing to me" and ask about dropping the most recent order of protection against him. Defendant told Agent Legg that Ms. Nostrom previously contacted him from numbers that showed as "restricted" on Defendant's cellular phone, which "brought up some red flags" to the Defendant, who then claimed that "prostitutes do that." When Defendant arrived at the school bus garage, he saw Ms. Nostrom "ready to get in [her] bus." He then said he saw Mr. Gunter walking quickly toward Defendant's van; Defendant pulled a handgun from the van's center console and shot Mr. Gunter through an open van window while still seated in the van. Defendant then walked toward Ms. Nostrom, who was walking toward him. Defendant told Agent Legg that he (Defendant) then "hit" her in the head; Defendant clarified that he shot her in the head. Ms. Nostrom did not say anything to Defendant before she was shot. Defendant then put the gun to his head and pulled the trigger, but he survived, with the bullet grazing the top of his head.

Defendant told Agent Legg that he had learned about his wife's bankruptcy the spring before the shooting. He had never noticed any money problems because Ms. Nostrom paid the bills. However, he claimed that persons at the bank told him that Ms. Nostrom was "pulling money out and pulling money out," which led Defendant to change his wife's bank access. Defendant also noted that after his wife first moved out of the house, she would call him at night, but after a while she stopped calling him. Defendant explained that after his wife moved out of the house, she would leave her apartment on Fridays and not return until Sundays; he claimed Ms. Nostrom "couldn't wait to get gone" on weekends. Defendant told Agent Legg that after his wife left, Defendant would drive around town, but he denied that he was looking for his wife on these trips.

Defendant admitted to Agent Legg that he was supposed to turn over his guns per the order of protection. As stated above, Defendant admitted he kept the handgun used in

these offenses in the center console of his van. Defendant initially told the interviewers that he "forgot all about it," but he later said, "I probably kept that one. It was a small gun. I just kept it, you know? What else can I tell you?"

Agent Legg recalled Defendant's interview began shortly after midnight the morning of September 15, 2018, and the agent denied noticing anything at the start of the interview that caused him concern. Agent Legg testified that Defendant was able to discuss the previous day's events and the events which led to the shootings, and Defendant appeared eager to do so. As at the suppression hearing, Agent Legg testified that Defendant began talking as soon as he entered the interview room, and the agent "had to stop him, slow him down, so . . . I could read him his waiver of rights." This straying off course continued throughout the interview, with Defendant "always talking about other things, bankruptcy, being a police officer in New York, and so on[.]" Agent Legg testified that Defendant did not say anything during the interview about seeing Mr. Gunter carrying a gun or other weapon.

Agent Legg acknowledged that in addition to his prior felony convictions, Mr. Gunter had also gone by the name Mark Wagner. The agent also acknowledged that the Dodge Neon, in which the victims arrived at the bus garage (with Mr. Gunter driving), was found by crime scene investigators with its driver's door open and engine running. When cross-examined about his contention that four shots were fired based on the bullet strike to the bus and three victims being shot, Agent Legg surmised that the fourth shell casing could have become stuck in the boot of EMS or fire department personnel who responded to the scene—especially considering that the .380 caliber shell casing "is a smaller diameter shell casing than your standard rounds." However, Agent Legg acknowledged that the boots of first responders were not checked for shell casings. Agent Legg also acknowledged the possibility that fewer than seven rounds were loaded into the magazine that Defendant put into his gun before the shooting. Agent Legg further noted that the gunshot that grazed Defendant's head could have hit the bus, but the agent found this unlikely because the bullet strike on the bus was below the height of Defendant's hair line (where he was shot), and therefore the Defendant would have had to fire his gun at a downward angle to hit both his scalp and the bus. Agent Legg acknowledged that the two school transportation employees, Ms. Reed and Mr. Upchurch, testified that they heard three shots. Mr. Pugh testified he heard four shots, but Agent Legg acknowledged that Mr. Pugh was farther away from the shooting than were the school transportation employees.

Agent Legg confirmed that at the time of the interview, he was aware Defendant had been flown from the bus garage to Erlanger Hospital before being driven back to Cumberland County. Agent Legg was not aware at that time that Defendant had been given fentanyl as part of his treatment. The agent acknowledged that Defendant claimed he had no idea why he did what he did and did not say that he planned to kill the victims. Agent

Legg also acknowledged that a 911 call placed the day before the shootings corroborated Defendant's claim that Ms. Nostrom had taken a truck from a repair shop after Defendant brought in the truck for service. As of the interview, Agent Legg was unaware of Defendant approaching the victims at the restaurant the summer before the shootings. Agent Legg acknowledged that in Defendant's statement, Defendant told the agent that Ms. Nostrom said nothing before he shot her, contrary to Mr. Pugh's assertion about hearing her scream before she was shot.

Gulpreet Bowman, a forensic pathologist, conducted the victims' autopsies. Dr. Bowman testified that Ms. Nostrom died from a gunshot wound to the head. Dr. Bowman found no soot or pattern tattooing on the entrance wound, which led the pathologist to opine that Ms. Nostrom was not shot at close range. Ms. Nostrom had traces of phentermine, an appetite suppressant, in her system when she died. Dr. Bowman concluded Mr. Gunter died from a gunshot wound to the chest; this wound also had no soot or pattern tattooing present, which led Dr. Bowman to opine that the fatal gunshot did not come from close range. Dr. Bowman concluded the manner of both victims' deaths was homicide.

Defendant did not testify or present any witnesses on his behalf. His only evidence was a photograph of the two victims, which was found at Ms. Nostrom's apartment, and Defendant's treatment records from Erlanger Hospital and the flight to the hospital.

After its deliberations, the jury found Defendant guilty as charged of two counts of first degree premeditated murder. Upon agreement of the parties, the trial court imposed concurrent life sentences. This appeal followed.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant contends the evidence produced at trial was insufficient for the jury to find him guilty of first degree premeditated murder. Specifically, Defendant contends that the evidence was insufficient to establish premeditation because Mr. Gunter provoked Defendant's actions "by aggressively charging him," and therefore Defendant "was not free from excitement and passion" when he shot the victims. We disagree.

#### 1. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v.*

*Louisiana*, 406 U.S. 356, 362 (1972)), *abrogated on other grounds by Ramos v. Louisiana*, 140 S. Ct. 1390 (2020); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). This standard of review is identical whether the conviction relies on direct evidence, circumstantial evidence, or a combination of both. *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Consequently, we are precluded from re-weighing or reconsidering the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

### 2. First Degree Premeditated Murder

Defendant was charged with and convicted of first degree murder. As charged, "first degree murder is: [a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). Premeditation is defined in Tennessee Code Annotated section 39-13-202(e) as:

> An act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

"The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing." *State v. Jackson*, 173, S.W.3d 401, 408 (Tenn. 2005) (citing *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003)). The jury "may infer premeditation from the manner and circumstances of the killing." *Id.* (citing *Bland*, 958 S.W. 2d at 660).

- 14 -

Tennessee courts "have long recognized that premeditation may be proved by circumstantial evidence' because 'premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." *State v. Morgan*, No. E2018-02245-CCA-R3-CD, 2020 WL 3032878 at *6 (Tenn. Crim. App. June 5, 2020) (quoting *Davidson*, 121 S.W.3d at 614-15). Our supreme court has identified several specific circumstances that may demonstrate the existence of premeditation:

> (1) The use of a deadly weapon on an unarmed victim;
> (2) The particular cruelty of the killing;
> (3) Threats or declarations of intent to kill;
> (4) The procurement of a weapon;
> (5) Any preparations to conceal the crime undertaken before the crime was committed;
> (6) The destruction or secretion of evidence of the killing;
> (7) Calmness after the killing;
> (8) Evidence of motive;
> (9) The use of multiple weapons in succession;
> (10) The infliction of multiple wounds or repeated blows;
> (11) Evidence that the victim was retreating or attempting to escape when killed;
> (12) The lack of provocation on the part of the victim; and
> (13) The failure to render aid to the victim.

*State v. Reynolds*, 635 S.W.3d 893, 916-17 (Tenn. 2021). This list "is not exhaustive," and "the trier of fact is not limited to any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment." *Id.* at 917 (quotation marks omitted).

Here, when the evidence produced at trial is viewed in the light most favorable to the State, Defendant and Ms. Nostrom were going through an arduous divorce that left him "broken hearted." In his interview with Agent Legg, Defendant gave several other possible motives for killing both victims: his wife's infidelity with Mr. Gunter, Ms. Nostrom's spending habits causing a bankruptcy, and her stealing vehicles from Defendant (including once within twenty-four hours of the shootings). Defendant admitted that upon seeing the victims drive to the school bus garage, he followed them there. While Defendant told Agent Legg that he only intended to talk to Ms. Nostrom, Defendant possessed a handgun that he was supposed to have turned over pursuant to the order of protection. Defendant claimed he shot the victims after Mr. Gunter charged toward him, but neither victim was armed and Defendant was in a car while Mr. Gunter was on foot. After shooting Mr. Gunter, Defendant exited the car, walked toward Ms. Nostrom and shot her without any

- 15 -

words exchanged. After shooting each victim, Defendant made no attempt to render aid. The jury considered all of this and rejected any possible heat of passion defense by finding Defendant guilty of first degree murder, as was the jury's right.

Defendant's motives for the killing, his use of a weapon upon the unarmed victims, his refusal to render aid, and the lack of provocation from Ms. Nostrom were all circumstances from which, in connection with the entirety of the evidence, the jury could infer that Defendant acted with premeditation in killing the victims. Defendant contends the inapplicability of many factors listed in *Reynolds*, coupled with Mr. Gunter's rushing toward Defendant upon Defendant's arrival at the school bus garage, all support his contention that Defendant did not act with premeditation. However, as the State notes in its brief, even if Defendant felt some excitement and passion during the killings, Tennessee's first degree murder law only requires a person to be "sufficiently free" from excitement and passion to be capable of premeditation. *See* Tenn. Code Ann. § 39-13-202(e). The evidence detailed above was sufficient for the jury to find the existence of premeditation beyond a reasonable doubt, and there is no dispute that the proof established beyond a reasonable doubt that Defendant intentionally killed the victims by shooting them.

Accordingly, the proof was sufficient for the jury to find Defendant guilty of two counts of first degree murder, and he is not entitled to relief on this issue.

## B. Competency to Stand Trial

Defendant contends the trial court erred in finding him competent to stand trial and in refusing to allow criminal defense attorney Hank Hill to offer expert testimony as to Defendant's ability to communicate with counsel and aid in preparing his defense. We disagree.

### 1. Competency Hearing Testimony

On the same day as the hearing on Defendant's motion to suppress, the trial court also conducted a hearing on Defendant's competency motion. Dr. Montgomery testified on Defendant's behalf. In addition to the testimony summarized above, Dr. Montgomery acknowledged that when he prepared his report in November 2020, he concluded that Defendant was competent to stand trial. He further concluded that Defendant understood the nature of the proceedings against him "basically by asking [Defendant] a series of questions about his knowledge and familiarity with courtroom personnel and their respective duties and obligations within that system[.]" Dr. Montgomery acknowledged he was not a defense attorney, but when asked whether trial preparation went beyond "very basic and rudimentary knowledge of the court system," Dr. Montgomery responded, "I

mean, we take that in[to] consideration. We will speak with attorneys when we do these types of evaluations, ask them if they're having any specific difficulties with the person that they're trying to assist."

The State presented the testimony of Marsha Slatten, a psychologist, who the trial court accredited as an expert in certified forensic evaluations. She administered Defendant the McGarry Competency Assessment Instrument ("McGarry Test"), which she described as "a structured interview" which "addresses all the areas of competency, whether the person has a basic understanding of court works, understanding of court. And it also looks at. . . if they have any self-defeating behaviors, if they are able to work with their attorney."

Dr. Slatten testified that she did not have difficulty communicating with Defendant, though at times she "had to redirect him. He had some circumstantial speech, which is kind of getting off, like, what we were talking on, he would give me irrelevant information sometimes. But I was able to redirect him back to the questions." She was able to conduct the McGarry Test in its entirety. Before conducting the test, Dr. Slatten had reviewed the evaluations conducted by Dr. Montgomery and Dr. Spica, and based on their reports she "wanted to make sure of [Defendant's] ability to reason, his abstract reasoning. I wanted to make sure how much he had left of abstract reasoning with dementia." After her testing, Dr. Slatten "found him to still have quite a bit of abstract reasoning," as well as "some concrete reasoning." Dr. Slatten acknowledged that after asking Defendant about his understanding of certain roles in the court system, Defendant's answers reflected he understood those roles (such as those of judge, prosecutor, and defense counsel). Based on Defendant's performance on the assessment, Dr. Slatten concluded Defendant was competent to stand trial.

Defense counsel also attempted to introduce the testimony of Chattanooga criminal defense attorney Hank Hill. The defense wanted Mr. Hill to offer expert testimony as to whether Defendant was competent to stand trial under the appropriate Tennessee legal standard. Specifically, defense counsel wanted Mr. Hill to testify on the third prong of the competency test—whether Defendant was capable of assisting in the preparation of his defense. Counsel stated, "for Your honor to understand that, it takes a lawyer to testify what is required." The trial court expressed concern about a defendant's potential malingering as to that question, asking, "[W]hat if the defendant is choosing, by his own accord, that he's not going to participate, or he's putting on a [ruse] about whether or not to participate?" The court reasoned that while an attorney could testify as to a client's purported inability to participate in his defense, a mental health expert was needed to determine whether "that choice he's making [is] rational or not, or is it some mental defect or disease[.]" The court added:

[I]t's this [c]ourt's opinion, for a witness to testify one's not capable to assist, that becomes a—that becomes a decision that an expert makes on the psychological issues of the defendant. Because you are making a decision at that point that that person does not possess the mental acumen or the ability to assist, and that is to me, you've crossed the line into expert testimony in psychology and things of that nature. So that's the reason why I'm not going to allow [Mr. Hill] to do that.

The trial court concluded Mr. Hill could not offer expert testimony on Defendant's ability to assist in his defense, but the court did permit the defense to offer Mr. Hill's testimony as an offer of proof into the record.

Mr. Hill testified that he met with Defendant four times before the hearing (including the morning of the hearing) and reviewed crime scene video, the psychological evaluations, and Defendant's interview with TBI. Mr. Hill explained that Defendant consistently told him that the shootings were accidental and that his wife either died from something unrelated to the shooting or she was still alive. Mr. Hill said that at one meeting, Defendant would talk only about issues related to his housing at the local jail rather than the facts of the case. Mr. Hill testified, "I don't think that he's capable of assisting you and preparing for a defense in any sort of rational discussion with either counsel, with counsel he has now, or with me." Mr. Hill added that he could not diagnose Defendant with dementia, "but if he does have dementia, it's gotten significantly worse since the first time I talked to him until today." Mr. Hill spoke with Defendant shortly before the competency hearing, and he was "almost unable to get . . . any rational discussion with him today at all." On cross-examination, Mr. Hill acknowledged that in the past, he has retained psychologists or psychiatrists to opine whether a client is competent to stand trial.

At the end of the competency hearing, the trial court concluded, based on the experts from both sides concluding Defendant was competent to stand trial, that Defendant had not carried his burden to establish that he was incompetent.

## 2. Standards of Review

"Both the Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution prohibit the trial of a person who is mentally incompetent." *State v. Kiser*, 284 S.W.3d 227, 283 (Tenn. 2009) (first citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966); and then citing *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000) (other citations omitted)). "In Tennessee, a criminal defendant is presumed to be legally competent." *State v. Johnson*, 401 S.W.3d 1, 17 (Tenn. 2013) (first citing *State v. Reid*, 164 S.W.3d 286, 306-07 (Tenn. 2005); and then citing *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)). "A defendant bears the burden of proving

his or her incompetency by a preponderance of the evidence." *Johnson*, 401 S.W.3d at 17 (Tenn. 2013) (citing *Reid*, 164 S.W.3d at 308) (other citations omitted).

"To be competent to stand trial, a defendant in a criminal case must have 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel[,] and to assist in preparing his defense.'" *Reid*, 164 S.W.3d at 306 (first quoting *State v. Black*, 815 S.W.2d 166, 174 (Tenn. 1991); and then citing *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)). "The trial court's findings 'are conclusive on appeal unless the evidence preponderates otherwise.'" *Reid*, 164 S.W.3d at 306 (quoting *Oody*, 823 S.W.2d at 559).

Regarding the admissibility of expert testimony, Tennessee Rule of Evidence 702 provides, "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." The admissibility of expert testimony is entrusted to the sound discretion of the trial court, and "[r]eviewing courts will not reverse a decision regarding the admission or exclusion of expert testimony unless the trial court has abused its discretion." *State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010) (first citing *State v. Reid*, 91 S.W.3d 247, 294 (Tenn. 2002) (appendix)); *State v. Copeland,* 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

A proposed expert witness "may acquire the necessary expertise through formal education or life experience." *Reid*, 91 S.W.3d at 302 (citation omitted). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." *Id.* The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002).

In this case, both Dr. Montgomery and Dr. Slatten testified that after their testing, they concluded Defendant was competent to stand trial. In his report, Dr. Montgomery wrote that as of testing, Defendant "had an adequate understanding of his legal peril to enable him to assist his own attorney." Based on this testimony, the trial court concluded that Defendant failed to establish his lack of competency by a preponderance of the evidence, and our review of the record shows nothing to suggest that the evidence preponderates against the trial court's conclusions.

The Defendant's contentions on appeal focus largely on the trial court's refusal to allow Mr. Hill, a criminal defense attorney, to offer expert testimony regarding Defendant's competency. Although the trial court did not reference Rules 702 and 703 in concluding Mr. Hill was not qualified to offer expert testimony, we conclude the trial court did not abuse its discretion in refusing to allow Mr. Hill to offer expert testimony. We agree with the trial court that its assessment that a defendant's competency to stand trial is largely a medical and psychological determination was a reasonable one. We agree with the trial court that while an attorney can testify as to a defendant's apparent inability to assist counsel or otherwise aid in preparing his defense, a person without medical or psychological training would be ill-suited to determine whether the defendant's actions result from a genuine inability to assist counsel due to a mental disease or defect or medical issue, or from the defendant's attempts to manipulate legal proceedings for his benefit. But even if Mr. Hill were somehow qualified to offer opinion testimony as to Defendant's inability to assist counsel or aid in his defense, defense counsel admitted that Mr. Hill's testimony could not have aided the trial court in determining whether Defendant understood the nature of the proceedings against him. Without any proof favorable to the Defendant as to the first prong of the competency analysis, Mr. Hill's testimony as to the other two prongs of the competency analysis would have held little to no weight. And even if the trial court had considered Mr. Hill's testimony in determining Defendant's competency, his testimony would have been far outweighed by the credible testimony of Dr. Montgomery and Dr. Slatten, both of whom concluded Defendant was competent to stand trial.

In sum, we conclude the evidence produced at the competency hearing does not preponderate against the trial court's conclusion that Defendant was competent to stand trial, and the trial court did not abuse its discretion in refusing to allow Mr. Hill to testify as an expert. Defendant is not entitled to relief on this issue.

### C. *Miranda* Waiver and Voluntariness of Statement

Defendant argues the trial court erred in admitting his statement given to TBI after his arrest and treatment at Erlanger Hospital. He asserts that, contrary to the trial court's conclusions, his waiver of *Miranda* rights was not voluntarily, knowingly, and intelligently given.

On appeal, a trial court's factual findings on a motion to suppress are conclusive unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolution of conflicting evidence are matters entrusted to the trial court, and a reviewing court shall uphold the trial court's findings of

fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). However, we review the trial court's application of the law to the facts de novo. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution protect a person against compelled self-incrimination. The Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These procedural safeguards require an accused to be advised, prior to a custodial interrogation, that "he has the right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* "Pursuant to *Miranda*, custodial interrogation entails 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *State v. Goss*, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998) (quoting *Miranda*, 384 U.S. at 444). The protections provided under *Miranda* apply "when the defendant is in custody and is subjected to questioning or its functional equivalent." *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001) (emphasis added) (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980)). There is no dispute that in this case, Defendant was subject to a custodial interrogation.

The State may not use an accused's statements from a custodial interrogation unless: (1) the accused has been previously advised of his constitutional rights to remain silent and to an attorney, and (2) the accused knowingly, voluntarily, and intelligently waives those rights. *See Miranda*, 384 U.S. at 444. Whether the accused's *Miranda* waiver is voluntarily, knowingly, and intelligently made is determined by the totality of the circumstances under which the right was waived. *See State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). The waiver must be "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (citing *State v. Stephenson*, 878 S.W.2d 530, 544-45 (Tenn. 1994)). The State bears the burden of proving a knowing, intelligent, and voluntary waiver by a preponderance of the evidence. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997).

The Supreme Court has also held that a confession that is the product of coercive State action is involuntary. *See, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 163-64, (1986). At a suppression hearing, the State must prove the voluntariness of a confession by a preponderance of the evidence. *See State v. Stamper*, 863 S.W.2d 404, 405-06 (Tenn. 1994) (citing *Lego v. Twomey*, 404 U.S. 477, 486-87 (1972)). "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more

protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn.1994)). A confession may be considered voluntary if it is not the product of "any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *State v. Berry*, 154 S.W.3d 549, 577 (Tenn. 2004) (citing *Smith*, 933 S.W.2d at 455). Rather, the essential question is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." *State v. Kelly*, 603 S.W.2d 726, 728 (1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)).

Courts look to the totality of the circumstances in determining whether a confession is voluntary. *See Smith*, 933 S.W.2d at 455. In *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996), the Tennessee Supreme Court identified a non-exclusive list of factors for the trial court to consider in determining the voluntariness of a confession:

> The age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

(citations omitted).

"The ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary." *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000) (quoting *State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980)); *see also State v. Perry*, 13 S.W.3d 724, 738 (Tenn. Crim. App. 1999) (citations omitted) ("[A] statement provided by a suspect who is under the influence of drugs is admissible so long as the statement is coherent."). "Mental unsoundness will not render a confession invalid, so long as the evidence demonstrates that the suspect was capable of understanding and waiving his rights." *Perry*, 13 S.W.3d at 738 (citing *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)).

Here, Defendant points to several factors in arguing that his rights waiver was not knowing, intelligent, and voluntary. Defendant asserts that Dr. Montgomery testified that Defendant was not paying attention at the time he was advised of his *Miranda* rights. Defendant also emphasizes that he was seventy-four years old at the time of the interview, was not familiar with the interview process because he had never been in trouble with the law, and suffered from dementia and "severe cognitive issues which adversely affected his executive functioning, and correspondingly, his ability to pay attention and stay focused[.]" Defendant also asserts that he "was intellectually functioning on the level of a six[-]year[-]old child" and that "the aforementioned significant factors were compounded by lack of sleep, the acute trauma from the day's events, [and] the sedatives and narcotic pain medications [he] had received earlier that day due to the gunshot wound to his head[.]"

However, several other facts support the trial court's conclusion that the State established Defendant knowingly, intelligently, and voluntarily waived his rights at the time of the interview. Agent Legg characterized his interactions with Defendant as cordial and observed that Defendant was eager to talk. Although Defendant occasionally strayed from relating his version of the events relating to the victims' deaths, Agent Legg was able to redirect Defendant accordingly. While Defendant mentioned he had been awake since the previous morning at 3:30 a.m., he also mentioned lying "across the back seat with a pillow" until "maybe a quarter till 2:00 [p.m.], something like that," before heading "[r]ight to Speedway." Further, Lt. Lester's testimony shows Defendant napped while the lieutenant drove him after he was discharged from Erhlanger in Chattanooga until they arrived at Crossville. There is no proof in the record suggesting that Defendant suffered from food or sleep deprivation at the time of the interview; Defendant did not mention being tired or hungry during the interview. Defendant was given pain medications and sedatives before and during his treatment at Erlanger, but there is nothing in the record suggesting that the medications' effects on Defendant were anything other than what Dr. Fox opined they were: short-lasting. Agent Legg did not observe Defendant acting as if he were feeling the ill effects of any medication, and perhaps more convincingly, hospital records reflect Defendant was alert at the time he was discharged from the hospital. Additionally, there is nothing in the record suggesting that Defendant was threatened or abused in any way before or during the interview. Finally, while Defendant asserts that his waiving his constitutional rights at the beginning of the interview before invoking his right to counsel at the end of the interview reflected Defendant acted irrationally, we agree with the State's assessment that such actions reflect Defendant understood his rights and knew when to invoke them.

In light of the above evidence, we conclude that the evidence at trial does not preponderate against the trial court's conclusion that the State established Defendant knowingly, voluntarily, and intelligently waived his rights at the start of the interview. Those same facts also lead this court to conclude Defendant's resulting statement was

voluntary and did not result from coercion. Defendant is therefore not entitled to relief on this issue.

## D. Denial of Continuance

Defendant contends the trial court abused its discretion when it refused to grant a continuance "based on the last minute change of opinion" of Dr. Montgomery, who had testified for the defense at the pretrial hearings addressing Defendant's competency and his motion to suppress his statement. Defendant argues the trial court's denial of the continuance denied his ability to retain an alternate mental health expert to provide critical evidence that was both relevant and material.

### 1. Hearing on Motion

On Monday, September 13, 2021, the day before trial in this case was to begin, defense counsel filed a motion to continue the trial based in part[2] on Dr. Montgomery's unwillingness to offer testimony that Defendant lacked the capacity to form the requisite mental state of premeditation. At the hearing on the motion, defense counsel stated that Dr. Montgomery had worked with the defense since 2019.[3] On the Saturday before this hearing, Dr. Montgomery informed defense counsel that "his previous opinion regarding [Defendant's] ability to form any degree of premeditation had potentially changed, and he would no longer be able to offer any opinion that might benefit us, or help in assisting the defense." Defense counsel asserted that Dr. Montgomery's decision caused the defense strategy to "change[] abruptly. And, again, we believe that affects directly and adversely [Defendant]'s constitutional rights[.]" Counsel sought a continuance "in order to seek out and obtain an additional expert that may be better able to assist us in his defense."

The State acknowledged that the evaluation conducted by Dr. Montgomery and the testing conducted by Dr. Spica indicated that Defendant suffered from Lewy body dementia, which would "have an effect on . . . [Defendant's] ability to form premeditation[.]" The State emphasized that the Dr. Montgomery's report was compiled "approximately a year and nine months after the event, not at the time of the event." Furthermore, Dr. Spica's evaluation "was done in excess of two years . . . following the

---

[2] The motion to continue raised two grounds; the only ground being addressed in this appeal is Dr. Montgomery's withdrawal from the case on the eve of trial.

[3] In his report, completed November 2, 2020, Dr. Montgomery wrote that Defendant, on the day of the offense, "was not thinking calmly and rationally" and suffered from depression and dementia. Dr. Montgomery added that Defendant's "mental disorders of major disorder and major neurocognitive disorder caused him to lack the capacity for premeditation. . . . [H]e was not sufficiently free from excitement and passion as to have been capable of exercising reflection and judgment prior to acting."

- 24 -

homicide. And [Dr. Montgomery's] testimony on cross-examination was, he didn't look at anything other than some old medical records." Thus, the State contended that Dr. Montgomery's assessment that he could no longer testify about diminished capacity "was likely."

In denying the continuance, the trial court recounted that Defendant's indictment was returned January 7, 2019. The court continued, "And since then, we've had numerous hearings, but we've also been interrupted by Covid, for sure[.]" The court continued that even during pandemic-related court system slowdowns, "the process never complete[ly] stopped on [Defendant]'s case." The trial court added,

> I think the Tennessee Constitution and the United States Constitution guarantees a fair trial, but it doesn't guarantee a perfect trial. There's no such thing. Perfect trials don't happen. We get as good as we can, and we try to make them as good as we can, but they're human, and there may be human parts, and human parts always fall short.

> And so we've got an expert that was working with the defense throughout all of this, and he's changed his opinion. And I don't know that there's any prejudice in that. And the defense could argue, ["]Well, Judge, we can't find anybody else that can say there is in this amount of time.["] And I appreciate that, and I understand that. But it seems to me, that expert, just like a witness, at the last second could change their mind and decide that they see things—you know, they see the color is blue instead of red, and it throws a monkey wrench into the case. These are the things that happen at trial. And if the [c]ourt grants a continuance on every single time that we have a witness that changes their opinion, then, it seems to me like, these types of cases could go on indefinitely. And so I don't—at this point, we're going to move forward with the trial.

### 2. Standard of Review

The grant or denial of a continuance rests within the sound discretion of the trial court. *State v. Rimmer*, 250 S.W.3d 12, 40 (Tenn. 2008) (citing *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004)). This court will reverse the trial court's decision to deny a continuance "only if it appears that the trial court abused its discretion to the prejudice of the defendant." *Odom*, 137 S.W.3d at 589 (citing *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995)). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *Hines*, 919 S.W.2d at 579 (citing *State v. Wooden*, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983)). If

a defendant claims that the denial of a continuance constitutes a denial of due process, the defendant bears the burden of establishing actual prejudice. *Rimmer*, 250 S.W.3d at 40 (citing *Odom*, 137 S.W.3d at 589).

Here, we agree with the State that Defendant has failed to establish the trial court abused its discretion in denying Defendant's continuance motion. Defendant failed to show actual prejudice because at the motion for new trial hearing, Defendant failed to present evidence (in the form of witness testimony, affidavit, or otherwise) that had a continuance been granted, Defendant would have found an expert able to conclude Defendant lacked the capacity to premeditate his actions. *See, e.g.*, *State v. Russell*, 10 S.W.3d 270, 275 (Tenn. Crim. App. 1999) ("If the defendant wished to demonstrate prejudice, he could have done so by submitting an affidavit of the [supposed] material witness in support of the motion for continuance or presenting the witness's testimony at the hearing on the motion for new trial"); *State v. Winston*, No. W2021-01315-CCA-R3-CD, 2022 WL 17665684, at *18 (Tenn. Crim. App. Dec. 14, 2022) (defendant failed to show prejudice when he "did not present any proof at the hearing on the motion for new trial establishing that additional time to review the records and conduct a further investigation could have provided additional helpful evidence"), *perm. app. denied* (Tenn. Mar. 8, 2023). Furthermore, even if Defendant had presented proof at trial concerning his inability to premeditate, such proof would have had to be weighed against the ample proof of premeditation set forth above. Because Defendant has failed to establish the trial court's denial of the continuance prejudiced him, we conclude the trial court did not abuse its discretion in denying the continuance motion. Defendant is not entitled to relief on this issue.

## III. Conclusion

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

MATTHEW J. WILSON, JUDGE